## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| DORISELENA ORTIZ, | CASE NO. 1:25-CV-00703-BYP |
| Plaintiff, | JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Doriselena Ortiz challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Apr. 8, 2025). For the reasons below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for further administrative proceedings.

### PROCEDURAL BACKGROUND

Ms. Ortiz applied for DIB in February 2023 alleging disability beginning April 21, 2020, due to vision problems, lupus, seizures, tremors, colon removal, anxiety, and depression. (Tr. 73, 223). After the claim was denied initially and on reconsideration, Ms. Ortiz requested a hearing before an administrative law judge. (Tr. 72, 84, 134). On December 15, 2023, Ms. Ortiz (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 45-71). On April 19, 2024, the ALJ determined Ms. Ortiz was not disabled. (Tr. 17-42). On February 14,

2025, the Appeals Council denied Ms. Ortiz's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Ms. Ortiz timely filed this action on April 8, 2025. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Ms. Ortiz was 40 years old on her alleged onset date and 44 at the hearing. (*See* Tr. 73). She graduated from high school and has past relevant work experience as a pastry cook and home health aide. (Tr. 37, 49).

## II.     Relevant Medical Evidence

**2020.** On June 10, 2020, Ms. Ortiz visited St. Vincent Charity Medical Center's Health Care Clinic (the Clinic) for joint pain at the wrists, elbows, and shoulders and difficulty grasping with her right hand due to pain in her fingers. (Tr. 446). She described continuous pain that is worse in the morning and limited range of motion. (*Id.*). In addition, she reported fatigue and joint swelling. (Tr. 447). Her provider noted tenderness in her right wrist, elbow, and fingers and "subtle synovial swelling." (Tr. 447, 452). The provider prescribed diclofenac sodium[1] and ordered lab work to check for autoimmune conditions. (Tr. 448, 452).

On June 28, Ms. Ortiz visited the emergency department and complained of pain in multiple joints for the past two months. (Tr. 505). Her physical examination showed some

---

[1]      Diclofenac sodium is a non-steroidal anti-inflammatory drug (NSAID) used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. *Diclofenac, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a689002.html (last accessed Feb. 17, 2026).

tenderness and swelling in her arms and wrists. (Tr. 507). She was diagnosed with arthralgia and discharged after receiving an injection of ketorolac.[2] (Tr. 509-10).

She returned to the Clinic on July 1, reporting bilateral shoulder, hand, wrist, and finger joint pain; progressive weakness; and difficulty raising her arm above shoulder level. (Tr. 439). On examination, the provider noted normal strength and tone in all extremities; shoulder, forearm, and wrist tenderness; and tenderness and swelling between the metacarpophalangeal (MCP) and proximal interphalangeal (PIP) joints. (Tr. 442). Lab tests revealed mild normocytic anemia, abnormally high erythrocyte sedimentation rate (ESR), c-reactive protein (CRP), and antinuclear antibodies (ANA).[3] (Tr. 442, 445). The provider assessed her with myositis, inflammatory arthritis, and tendonitis-enthesitis, ordered more lab tests, and prescribed prednisone. (Tr. 445).

At the end of the month, Ms. Ortiz reported that prednisone significantly improved her symptoms, but her joint pain and early morning stiffness returned two weeks after she finished

---

[2]     Ketorolac is an NSAID used for short term relief of moderately severe pain. *Ketorolac, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a693001.html (last accessed Feb. 17, 2026).

[3]     Normocytic anemia occurs when there are fewer red blood cells than normal, and those blood cells do not have the normal amount of hemoglobin, which helps red blood cells carry oxygen throughout the body. Symptoms include fatigue and weakness. *Normocytic Anemia, Cleveland Clinic*, http://my.clevelandclinic.org/health/diseases/22977-normocytic-anemia (last accessed Feb. 17, 2026).

An ESR test measures the time it takes for red blood cells to settle at the bottom of a test tube. A high result means blood cells sank faster than normal, showing inflammation. *Erythrocyte Sedimentation Rate, MedlinePlus*, http://medlineplus.gov/lab-tests/erythrocyte-sedimentation-rate-esr/ (last accessed Feb. 17, 2026).

A CRP test measures the level of c-reactive protein in the blood and shows how much inflammation is present. *C-Reactive Protein Test, MedlinePlus*, http://medlineplus.gov/lab-tests/c-reactive-protein-crp-test/ (last accessed Feb. 17, 2026).

An ANA test looks for antinuclear antibodies in the blood. A high result is a sign of an autoimmune disorder, where the immune system attacks healthy cells in organs and tissues. *Antinuclear Antibody Test, MedlinePlus*, http://medlineplus.gov/lab-tests/ana-antinuclear-antibody-test/ (last accessed Feb. 17, 2026).

that steroid treatment. (Tr. 431). Her provider at the Clinic assessed her with arthritis and tendonitis-enthesitis, possibly caused by parvovirus, and prescribed a second round of prednisone. (Tr. 433, 438). The provider also prescribed ferrous sulfate, an iron supplement. (Tr. 437-38).

On October 28, Ms. Ortiz reported redness and itching at the back of her head and some improvement in joint pain. (Tr. 426, 430). The provider determined she had seborrheic dermatitis, prescribed medicated shampoo and a topical gel, and ordered lab work to check her inflammatory markers. (Tr. 430). Ms. Ortiz was also instructed to continue taking ferrous sulfate. (Tr. 428-29).

**2021.** By January 27, 2021, Ms. Ortiz's dermatitis had improved. (Tr. 418). She was referred to a rheumatologist for evaluation and treatment of psoriasis, joint pain, and muscle pain. (Tr. 414).

Two days later, Ms. Ortiz met with rheumatologist Isam Diab, M.D., for evaluation of her joint pain, stiffness, and generalized fatigue. (Tr. 626). On examination, Dr. Diab noted synovitis in both elbows; mild synovitis and moderate tenderness in the wrists; modest synovitis, swelling, and tenderness of multiple joints in both hands; minimal synovitis and tenderness in the knees, modest synovitis, swelling, warmth, and tenderness of the tarsus joints and anterior ankle, more in the right than in the left; and mild synovitis with moderate tenderness over the second, third, and fourth metatarsophalangeal joints, more in the right than in the left. (Tr. 627). Dr. Diab ordered lab work to investigate systemic lupus erythematosus (SLE), provided a methylprednisolone injection, and prescribed Plaquenil. (Tr. 626). He discussed the side effects of Plaquenil, including photosensitivity, bloating, diarrhea, headache, skin hyperpigmentation, and possible irreversible vision loss. (*Id.*).

4

On March 5, Ms. Ortiz returned to Dr. Diab's office and reported her joint pain and stiffness improved by 40% since her last appointment and she was tolerating the medication well. (Tr. 624). She endorsed moderate fatigue and had developed an itchy rash on her thigh. (*Id.*). On examination, Dr. Diab noted a malar-type rash and hyperpigmentation on her face, joint findings similar to her prior examination, and multiple tender points. (Tr. 624-25). Dr. Diab ordered more lab work. (Tr. 624).

On March 26, Ms. Ortiz returned to the Clinic for a rash. (Tr. 408). Physical examination revealed annular plaques around the groin and diffuse scaling on the scalp. (Tr. 410). Her provider prescribed a cream for the annular plaque and directed her to continue using the medicated shampoo. (Tr. 411).

Ms. Ortiz regularly attends counseling sessions for treatment of PTSD, generalized anxiety disorder, and major depressive disorder. (*See* Tr. 846). In February, the counselor noted Ms. Ortiz was anxious, irritable, and restless. (Tr. 847). In May, she reported planning a vacation with her children. (Tr. 819).

During a follow-up appointment on April 14, Ms. Ortiz reported that Plaquenil improved her joint pain, and she was "back to work." (Tr. 400). She also received a referral for a bariatric consultation to discuss weight-loss options. (Tr. 398).

On April 30, Ms. Ortiz returned to the Clinic for evaluation of her skin conditions. (Tr. 392). By this time, her groin rash had resolved and her scalp was clear, but she had erythema plaques on her cheeks. (Tr. 394-95).

During her June 18 appointment with Dr. Diab, Ms. Ortiz reported doing better compared to her last visit but still had some moderate fatigue, joint pain and stiffness, and photosensitivity. (Tr. 622). Based on high positive ANA and ESR testing, Dr. Diab assessed her with SLE. (*Id.*).

On July 14, she reported left knee pain when walking. (Tr. 384). Her knee was tender at the medial side, but she had full range of motion without swelling or tenderness. (Tr. 386). By October 31, Ms. Ortiz reported her left knee had improved. (Tr. 376).

On September 17, Ms. Ortiz followed up with Dr. Diab and complained of right shoulder and arm pain and left knee pain, both described as throbbing. (Tr. 620). She endorsed less fatigue, occasional stiffness and pain in her joints, less pronounced hair loss, and some photosensitivity. (*Id*). On examination, Dr. Diab noted a malar rash and hyperpigmentation on her face, modest right shoulder tenderness over the subacromial bursa, modest shoulder pain with abduction, minimally decreased shoulder rotation, and tenderness over the bicipital bursa. (Tr. 621). He refilled Plaquenil, diagnosed subacromial bursitis of the right shoulder joint, discussed helpful exercises, and suggested an injection if the shoulder pain did not resolve. (Tr. 620). One month later, Dr. Diab injected her subacromial bursa with triamcinolone.[4] (Tr. 618).

On December 14, Ms. Ortiz underwent a laparoscopic sleeve gastrectomy and hiatal hernia repair. (Tr. 577).

**2022.** Ms. Ortiz met with Dr. Diab again on January 7, 2022, and reported occasional joint stiffness and pain, some fatigue, and some interrupted sleep. (Tr. 610). Dr. Diab continued her prescription for Plaquenil. (*Id.*). That month, her mood was "all over the place" because she had

---

[4]     Triamcinolone is a corticosteroid used to reduce inflammation. *Triamcinolone Injection, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a625028.html (last accessed Feb. 17, 2026).

stopped taking her medications one week before undergoing gastric-sleeve surgery in December 2021. (Tr. 819).

On February 27, Ms. Ortiz visited the emergency department for left-sided chest pain associated with deep breathing and movement. (Tr. 517). A chest x-ray revealed airspace and consolidative opacities in the left lung that were "suspicious for multifocal pneumonia." (Tr. 521). After her chest pain resolved with morphine, Ms. Ortiz was discharged with a prescription for a Z-Pak.[5] (Tr. 522). She returned to the emergency department on March 2 with continued chest pain. (Tr. 523). Because her chest x-ray showed persistent left basilar pneumonia despite using antibiotics, she was admitted for evaluation. (Tr. 527). During admission, she developed a dry cough and worsening shortness of breath. (Tr. 555). Her treatment provider noted Ms. Ortiz had been off Plaquenil since December 2021. (*Id.*). Suspecting lupus-related lung disease, the provider restarted Plaquenil. (*Id.*). Ms. Ortiz's shortness of breath improved, and she was discharged on March 5 with prescriptions for methylprednisolone and levofloxacin.[6] (*Id.*).

On March 8, Ms. Ortiz visited the emergency department again with nausea, vomiting, and chest pain with coughing. (Tr. 529). A chest x-ray showed persistent infiltrate in the left lung. (Tr. 535). The treating provider prescribed antiemetics and cough syrup. (*Id.*).

---

[5]     Z-Pak refers to a pre-packaged course of azithromycin, an antibiotic used to treat bacterial infections such as pneumonia. *Azithromycin, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a697037.html (last accessed Feb. 17, 2026).

[6]     Methylprednisolone is a corticosteroid used to relieve inflammation. *Methylprednisolone, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682795.html (last accessed Feb. 17, 2026).
Levofloxacin is an antibiotic used to treat certain infections such as pneumonia. *Levofloxacin, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a697040.html (last accessed Feb. 17, 2026).

Ms. Ortiz returned to the Clinic on March 9 with dry cough, chills, and pleuritic chest pain. (Tr. 366-67). She denied joint pain or swelling. (Tr. 367). The treating provider determined her pneumonia was "more than likely lupus-related lung changes," ordered a chest x-ray, prescribed prednisone, and recommended that she restart Plaquenil. (Tr. 369, 372-73).

On April 7, Ms. Ortiz met with Dr. Diab and reported her recent hospitalization for pneumonitis and noted she was still taking prednisone. (Tr. 608). She had not had any rashes, oral ulcers, or joint pain since being discharged from the hospital, but she did endorse some pleuritic chest pain with deep breathing and significant fatigue and shortness of breath with minimal exertion. (*Id.*). Dr. Diab refilled her prescription for Plaquenil and prescribed more prednisone with instructions to taper down the dose. (Tr. 608).

At a follow-up appointment at the Clinic in June, Ms. Ortiz reported significant improvement, including complete resolution of dermatitis, and denied cough, fever, chills, fatigue, joint pain and swelling, chest pain, and shortness of breath. (Tr. 360). The provider referred her to a nephrologist to evaluate for any lupus-related renal issues. (Tr. 358).

On July 7, Dr. Diab prescribed Imuran.[7] (*See* Tr. 603).

On July 13, during her nephrology appointment, Ms. Ortiz denied headaches, vision changes, cough, congestion, rhinorrhea, sore throat, nausea, vomiting, abdominal pain, urinary symptoms, chest pain, and shortness of breath. (Tr. 353). The nephrologist ordered a renal function panel and urinalysis. (Tr. 355).

---

[7]     Imuran is a brand name for azathioprine, an immunosuppressant used to decrease activity of the body's immune system so it will not attack joints. *Azathioprine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682167.html (last accessed Feb. 17, 2026).

On August 19, during her follow-up appointment with Dr. Diab, Ms. Ortiz reported less stiffness, pain, and fatigue. (Tr. 604). Dr. Diab refilled her prescriptions for Plaqenil and Imuran. (Tr. 603).

Ms. Ortiz returned to the Clinic in September for a follow-up appointment. (Tr. 347). There she reported that her SLE symptoms were controlled with medication; she denied malaise, cough, fever, chills, fatigue, joint pain and swelling, chest pain, and shortness of breath, but complained of dandruff and decreased urination without other urinary symptoms. (Tr. 348). The provider ordered blood work and a urinalysis and prescribed medicated shampoo. (Tr. 349).

On September 6, Ms. Ortiz spoke with her counselor and reported difficulty sleeping. (Tr. 1247). She also reported working six days a week and going to the gym daily. (*Id.*).

Also in September, Ms. Ortiz met with her dermatologist who documented thick psoriasiform plaque on her scalp and hyperpigmented patches on her cheeks. (Tr. 344). The dermatologist prescribed medicated shampoo and clobetasol gel for scalp psoriasis and hydroquinone cream for melasma.[8] (*Id.*).

On October 2, Ms. Ortiz had a seizure. (Tr. 995). Her son heard her fall and found her convulsing. (Tr. 1000). This lasted about a minute before she started snoring. (*Id.*). She was confused when she came to but was back to baseline within minutes. (Tr. 995, 1000). Ms. Ortiz remembered walking and then waking up on the floor. (Tr. 1000). She described a history of childhood seizures that ceased around age 10. (*Id.*). Physical examination was normal. (Tr. 996-97). A CT brain scan showed no evidence of acute infarction, intracranial hemorrhage, or intracranial

---

[8]         Melasma is a skin condition that causes patches of dark skin on areas of the face exposed to the sun. *Melasma*, *MedlinePlus*, http://medlineplus.gov/ency/article/000836.htm (last accessed Feb. 17, 2026).

mass lesion. (Tr. 1003). She was discharged with a prescription for Keppra[9] and told to schedule an EEG. (Tr. 1004).

On October 13, Ms. Ortiz met with neurologist Jean Khoury, M.D., at the Cleveland Clinic Epilepsy Center. (Tr. 989-90). There, she reported being diagnosed with epilepsy at age 4 or 5. (Tr. 990). As a child, she had full-body seizures that began with uncontrollable right-hand movements. (*Id.*). She stopped taking antiseizure medications when she was 11 or 12. (*Id.*). Ms. Ortiz also recalled an episode in September 2021 when her daughter saw her drop her head, begin drooling, and did not respond to questions for about a minute. (*Id.*). She was laughing just before the episode began and remembered feeling confused but returned to baseline in five minutes. (*Id.*). She experienced the same post-seizure confusion on October 2. (*Id.*). She endorsed severe headaches and sensitivity to bright lights since the seizure and reported that Keppra makes her very sleepy. (*Id.*). Physical and neurological examinations were normal. (Tr. 993). Dr. Khoury determined Ms. Ortiz "likely has epilepsy," prescribed Trileptal[10] with instructions to gradually increase the dose, ordered an MRI, recommended that she not drive, and recommended magnesium oxide and riboflavin for her headache. (Tr. 993-94). An EEG did not show any epileptiform activity but was suggestive of mild dysfunction in the left temporal region that "could be indirectly indicative of left temporal epilepsy." (Tr. 988, 1135).

---

[9]     Keppra is a brand name for levetiracetam, an anticonvulsant used to control partial-onset seizures by decreasing abnormal excitement in the brain. *Levetiracetam, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a699059.html (last accessed Feb. 17, 2026).

[10]     Trileptal is a brand name for oxcarbazepine, an anticonvulsant used to control seizures by decreasing abnormal electrical activity in the brain. *Oxcarbazepine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601245.html (last accessed Feb. 17, 2026).

Ms. Ortiz returned to the Epilepsy Center on November 4 and denied further seizure activity. (Tr. 985). She did not increase her dose of Trileptal as directed because the starting dose made her tired. (*Id.*). Physical and neurological evaluations were normal. (Tr. 987-88).

On November 9, Ms. Ortiz went to the hospital after she lost consciousness and fell, hitting her head and right hip. (Tr. 976). Her forehead was tender to palpation with minimal swelling and she had pain with hip flexion. (Tr. 976, 978). She endorsed mild daily headaches since her seizure in October. (Tr. 960). CT scans of her brain and right hip were negative for acute findings. (Tr. 980-81). An MRI of her brain was unremarkable. (Tr. 970). A neurology consultant noted Ms. Ortiz's oxcarbazepine level was at the lower end of the therapeutic range. (*Id.*). She directed Ms. Ortiz to increase the dose even if it made her sleepy, explaining that her body would adjust to the medication. (*Id.*). A cardiology workup showed no abnormalities. (Tr. 971). She was discharged on November 11. (*Id.*).

Ms. Ortiz returned to the Epilepsy Center on November 18 for a follow-up appointment. (Tr. 947). She reported increased fatigue and insomnia with the increased dose of Trileptal but denied further seizure activity. (Tr. 948). Her physical and neurological examinations were normal. (Tr. 950-51). Dr. Khoury prescribed an increased dose of Trileptal, advising her to take 300 mg in the morning and 450 mg at bedtime. (Tr. 951).

**2023.** Ms. Ortiz met with Dr. Khoury again on January 13, 2023, complaining of fatigue and daily headaches with photophobia that worsen with movement. (Tr. 941, 944). She endorsed some relief with Tylenol and Advil, but reported the headaches return within hours. (Tr. 941). She denied associated vision changes, nausea, and vomiting. (*Id.*). In addition, Ms. Ortiz described feelings of momentary weakness and dropping things from her right hand. (*Id.*). Dr. Khoury

determined she likely had "chronic migraine in the setting of medication overuse," advised her to use magnesium oxide and riboflavin for headaches instead of Tylenol, continued Trileptal, and prescribed a four-day course of Excedrin. (Tr. 945).

On January 17, Ms. Ortiz met with Aarushi Suneja, M.D., at the Cleveland Clinic Neurological Institute for evaluation of her headaches. (Tr. 933). She described headaches beginning in October, with pounding, stabbing pain at the front, sides, and top of her head, and associated with occasional blurry vision, phonophobia, and agitation. (*Id.*). She also endorsed feeling very fatigued and unable to do things around the house. (*Id.*). She had right wrist, hand, and hip weakness on physical examination. (Tr. 937). Dr. Suneja diagnosed chronic migraine without aura, prescribed a short course of Parafon Forte[11] to break the headache cycle and reassess her symptoms and recommended she cease use of over-the-counter medications to avoid a medication-overuse headache. (*Id.*).

On January 23, Ms. Ortiz started physical therapy for her headaches, claiming they reduced her ability to concentrate and interfered with her daily activities, including cooking and cleaning. (Tr. 929). On initial evaluation, the therapist noted diminished strength in the right shoulder, elbow, and wrist. (Tr. 931).

The next day, Ms. Ortiz followed up with Dr. Diab and reported occasional stiffness and pain in her joints, some fatigue, and somewhat interrupted sleep. (Tr. 1226). Dr. Diab noted continued synovitis in her elbows and mild patellofemoral crepitus, but no synovitis, swelling, or

---

[11]     Parafon Forte is a brand name for chlorzoxazone, a medication used to relieve pain and stiffness. *Chlorzoxazone, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682577.html (last accessed Feb. 17, 2026).

tenderness in her wrists, hands, hips, knees, ankles, or feet. (Tr. 1233). He continued her prescription for 5 mg prednisone. (Tr. 1226).

On February 1, Ms. Ortiz reported intermittent episodes of shaking in her arms and head and was referred to the emergency department. (Tr. 924). There, she explained the tremors began in her hands, gradually worked up to her arms, and lasted about four hours. (Tr. 915). She denied losing consciousness during the episode. (*Id.*). Tremors were absent on examination. (Tr. 916). She also reported a slowly worsening headache since her arrival at the emergency department. (Tr. 917). A neurologist determined her tremors were likely not epileptic shaking but could be related to sleep deprivation and recommended a migraine cocktail for her headache. (*Id.*). Her headache resolved with the treatment. (*Id.*). She was discharged and directed to follow up with her neurologist. (*Id.*).

On February 4, Ms. Ortiz reported to the emergency department with right-sided abdominal and flank pain, nausea, and vomiting. (Tr. 887). An exploratory laparotomy revealed cecal volvulus, a form of intestinal obstruction requiring surgical repair. (Tr. 895-97). She was discharged on February 7. (Tr. 911). She followed up with the surgeon on February 17 and described achy abdominal pain that had improved a little each day. (Tr. 879).

Ms. Ortiz spoke with her counselor again on March 3 and reported that she ran out of her mental-health medications (Lexapro, Abilify, gabapentin, and Remeron) and was depressed, had low energy, struggled to keep up with chores, felt on edge, and was not sleeping well. (Tr. 1247).

On March 8, Ms. Ortiz had another seizure that lasted two minutes. (Tr. 877). She bit her lip during the seizure and returned to baseline within five minutes. (*Id.*). She was advised to increase her nighttime dose of Trileptal to 600 mg. (Tr. 878).

13

During her third physical therapy session on March 16, Ms. Ortiz reported improvements, including fewer headaches (2 to 3 a week) that were less intense. (Tr. 874-75).

On March 23, Ms. Ortiz met with her primary care provider and endorsed headaches and tremors. (Tr. 1491). The provider prescribed Imitrex[12] and explained the tremors were likely a side effect of her migraine medication. (Tr. 1492).

On March 27, Ms. Ortiz followed up with Dr. Suneja and reported her headaches had resolved. (Tr. 871).

On April 11, Ms. Ortiz spoke with her counselor on the phone and reported irritability, agitation, anxiety, low energy, and insomnia. (Tr. 1247). She endorsed frustration with her right-sided arm and hand weakness. (*Id.*) ("I can't even lift a pot due to my right-sided weakness").

On April 28, Ms. Ortiz attended a physical therapy session where she reported more headaches and increased pain, reducing her ability to concentrate and interfering with her daily activities. (Tr. 1182). At her next session on May 10, she reported headaches occurring with decreased frequency. (Tr. 1181). She was discharged from physical therapy in June after ten sessions. (Tr. 1172-73).

On May 9, Ms. Ortiz met with Dr. Diab and reported fatigue, mild back pain, muscle aches, and shoulder pain. (Tr. 1217-18). Dr. Diab suspected anemia from iron deficiency and determined her fatigue could also be associated with her depression, SLE, deconditioning, vitamin deficiencies, or hypothyroidism and ordered lab tests to investigate. (Tr. 1216). Dr. Diab refilled

---

[12]     Imitrex is a brand name for sumatriptan, a nasal spray used to treat the symptoms of migraine headaches by reducing pain signals in the brain. *See Sumatriptan Nasal*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a614029.html (last accessed Feb. 17, 2026).

her prescriptions for Imuran, Plaquenil, and prednisone. (Tr. 1217). Lab tests showed low thyroid and iron panel levels. (Tr. 1207-08).

Ms. Ortiz returned to her primary care physician on May 12 and reported that Imitrex was effective for her headaches. (Tr. 1489).

In June, Ms. Ortiz reported to her counselor that she was sleeping better but could not get things done around the house because of her right-sided weakness. (Tr. 1247). She struggles with chores, cannot lift pots or pans, and relies on her children for help around the house. (*Id.*). Ms. Ortiz was prescribed Seroquel in lieu of Remeron. (*Id.*).

On July 30, Ms. Ortiz had another seizure. (*See* Tr. 1463). Before the episode, her heart was pounding, and her arms and legs began to twitch and shake. (*Id.*). She next remembers waking up on the floor. (*Id.*). During the seizure, she bit her lips and tongue. (*Id.*). She was directed to increase Trileptal to 600 mg twice a day. (*See* Tr. 1467).

In August, Ms. Ortiz described mood swings and was prescribed sertraline.[13] (Tr. 1487). During her follow-up appointment with Dr. Diab on August 8, Ms. Ortiz had "no complaints." (Tr. 1204). She reported having shoulder pain that resolved after one week. (Tr. 1206). Dr. Diab noted she was stable on her current medications and tolerating them well. (*Id.*). He diagnosed anemia from iron deficiency based on recent lab tests. (Tr. 1204).

On September 15, Ms. Ortiz met with Dr. Khoury and reported tolerating the increased dose of Trileptal but noted trouble falling asleep. (Tr. 1463). Dr. Khoury continued Trileptal, prescribed Zonisamide for headache and seizure prevention, and ordered an ambulatory EEG to

---

[13]     Sertraline is an antidepressant used to treat, among other things, depression and panic attacks. *Sertraline, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a697048.html (last accessed Feb. 17, 2026).

evaluate her seizures.[14] (Tr. 1467). The results of the ambulatory EEG suggested cortical dysfunction in the left frontotemporal region but did not record any definitive epileptiform discharges or seizures. (Tr. 1448-49).

Later that month, Ms. Ortiz spoke with her counselor and reported "constant headaches." (Tr. 1281). Lab tests dated September 20 showed that her red blood cell count, hemoglobin, and hematocrit levels were at the low end of the normal range. (Tr. 1423).

On November 2, Ms. Ortiz returned to her primary care physician and reported daily morning headaches in the frontal area that worsen when she leans forward. (Tr. 1485). Her provider suspected chronic sinusitis was causing her headache symptoms and prescribed an antihistamine. (Tr. 1486).

On November 7, Ms. Ortiz met with Dr. Diab and reported a recurrent mouth ulcer; more stiffness and pain in the joints of her hands, wrists, feet, and ankles; generalized fatigue; some hair loss; and interrupted sleep. (Tr. 1193). Dr. Diab noted synovitis in both elbows and "modest synovitis with moderate tenderness over medial side of the right wrist more than the left, with modest synovial thickening." (Tr. 1202). He ordered lab tests and refilled Ms. Ortiz's prescriptions. (Tr. 1192). Test results showed low red blood cell count, hemoglobin, and hematocrit levels. (Tr. 1413).

## III.   Administrative Hearing Testimony and Other Relevant Evidence

In December 2023, Ms. Ortiz testified she cannot work because of her lupus and seizures. (Tr. 53). When her lupus flares, her joints hurt, her knees swell, she cannot lift her shoulder or

---

[14]     Zonisamide is an anticonvulsant used in combination with other medications to treat seizures by decreasing abnormal electrical activity in the brain. *Zonisamide, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a603008.html (last accessed Feb. 17, 2026).

move her arms, sores form inside her mouth, and her skin breaks out in rashes. (Tr. 53, 60). Flareups last for a couple of days and sometimes up to two weeks. (Tr. 60). The flareups are so bad that she does not get out of bed 15 to 20 days each month. (*Id.*). The rashes occur on her face, causing redness and itching. (Tr. 61). Her fingers will get rashes that are very painful. (*Id.*). Her last seizure was in September 2023. (Tr. 53). She knows she is going to have a seizure when she "starts shaking" and must sit or lie down. (*Id.*). Ms. Ortiz also has migraines three to four times a week that last all day. (Tr. 54). She has anxiety, does not like to be around other people or enter stores, and "gets annoyed with everybody." (Tr. 56).

Ms. Ortiz takes Plaquenil and Imuran for lupus, Sumatriptan for migraines, and Lexapro for her mental health issues. (Tr. 55-56). Her medications cause drowsiness. (Tr. 56).

Ms. Ortiz can lift less than eight pounds. (*Id.*). She can stand for less than 15 minutes before her leg starts shaking. (*Id.*). Her doctor told her the shaking is a tremor. (Tr. 57). She can walk 10 minutes before feeling fatigued. (*Id.*). She cannot sit more than 15 to 20 minutes at a time before she feels anxious and needs to do something. (*Id.*). She described dropping items from her hands, like utensils. (Tr. 57, 59). She uses handrails when climbing stairs to avoid falling. (Tr. 58). She forgets simple things, like names, dates, and where she put something. (*Id.*). She has difficulty opening lids, fastening buttons, zipping zippers, and typing. (Tr. 58-59). She can handle a set of keys but will drop pills from her hands. (Tr. 59).

IV.     **Medical Opinions and Prior Administrative Medical Findings**

On April 13, 2023, Dr. Diab completed a Medical Source Statement (MSS) concerning Ms. Ortiz's SLE. (Tr. 1161-64). He listed her symptoms as fatigue, skin rashes, photosensitivity, polyarthritis, seizure disorder, multiple joint pains, and a history of pleurisy. (Tr. 1161). Flareups

affect the small joints in her hands and feet, wrists, elbows, knees, and ankles. (*Id.*). Clinical findings and objective signs include intermittent polyarthritis and photosensitivity-related skin rashes. (*Id.*). Dr. Diab also noted Ms. Ortiz's medications, including subcutaneous injections, cause possible dizziness, increased photosensitivity, and upper respiratory infections. (*Id.*). Dr. Diab opined Ms. Ortiz can sit for 30 to 45 minutes at a time and 4 hours total, stand for 15 to 20 minutes at a time and for about 2 hours total, must be able to walk around for 6 to 7 minutes every 45 minutes to an hour, and must take unscheduled 15-minute breaks, the number of which depends on when her SLE symptoms flare. (Tr. 1162). He opined she can lift and carry less than 10 pounds frequently, 10 pounds occasionally, and 20 pounds rarely, and she can handle, finger, and reach 20% of the workday. (Tr. 1163). Last, Dr. Diab described other factors that may contribute to SLE flareups including noise, chemicals, sun exposure, stress, and dust. (Tr. 1164).

In May 2023, state agency medical consultant Mehr Siddiqui, M.D., reviewed medical records concerning Ms. Ortiz's physical impairments. Citing synovitis, swelling, and tenderness in multiple joints, Dr. Siddiqui opined Ms. Ortiz can lift and carry 20 pounds occasionally and 10 pounds frequently and stand, walk, or sit for 6 hours each in an 8-hour workday. (Tr. 78). Due to her history of seizures, she could never climb ladders, ropes, or scaffolds, and could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. (Tr. 79). Due to her tremors, Dr. Siddiqui opined she could frequently perform handling (gross manipulation) and fingering (fine manipulation) maneuvers. (*Id.*). Last, he determined Ms. Ortiz must avoid all exposure to unprotected heights and hazardous moving machinery. (*Id.*). In July 2023, state agency medical consultant Nancy Cook reviewed updated medical records and adopted Dr. Siddiqui's findings. (Tr. 91).

In May 2023, state agency psychological consultant Daniel Malone, Ph.D., reviewed medical records concerning Ms. Ortiz's mental impairments and determined they are severe but do not seriously limit the mental RFC. (Tr. 77). He stated:

> The claimant is treated with psychiatric medications for major depressive disorder, generalized anxiety disorder, and PTSD. There are significant family stressors, and the claimant is frustrated with her health, noting weakness and seizure disorder . . . More recent observational and mental status evidence have been mostly unremarkable. The claimant's mental impairment could reasonably cause the reported symptoms. However, the severity of symptoms is not fully supported by the claimant's reported daily activities [lives with family, no problem with personal care attributed to mental impairment, occasionally prepares meals, shops by computer, pays bills, likes to be alone], nor is it fully supported by observational and other objective mental status assessments by medical sources. The symptomatology is less limiting than alleged.

(*Id.*) (cleaned up). Dr. Malone then evaluated her abilities and limitations in four areas of mental functioning. First, he determined Ms. Ortiz had no limitations in understanding and memory, emphasizing that there is "no recent objective evidence of any significant cognitive impairment." (Tr. 80). In the area of concentration and persistence, Dr. Malone concluded that her mental impairments are "not so numerous, intense, frequent, or pervasive as to seriously limit her ability to sustain . . . the independent and effective performance of work-related tasks" and "would not prevent her from sustaining work-related efforts for 2-hour periods between breaks of a normal workday." (*Id.*). Describing her social interaction capacity, Dr. Malone claimed Ms. Ortiz "may perform best in a non-public setting that requires minimal contact or interaction with others." (Tr. 81). Finally, in the area of adaptation, Dr. Malone concluded she would perform best in a work setting "that changes minimally from day to day" and that does not impose excessive speed or production-rate requirements. (*Id.*). On reconsideration in July 2023, state agency psychological consultant Jennifer Swain adopted Dr. Malone's findings. (Tr. 93).

On June 6, 2023, Po Ki Yang, PA-C, completed a mental impairment questionnaire concerning Ms. Ortiz's mental impairments. (Tr. 1166-67). Beginning in March 2020, PA Yang met with Ms. Ortiz about every two months for unspecified PTSD, generalized anxiety disorder, and major depressive disorder. (Tr. 1166; *see* Tr. 1239). When PA Yang completed the questionnaire, she was prescribing Seroquel, Abilify, and Lexapro, all of which were well-tolerated. (Tr. 1166). Clinical findings showing the severity of Ms. Ortiz's mental impairments include irritability, lack of proper decision-making, and disorganized thoughts. (*Id.*). PA Yang opined Ms. Ortiz was limited to some degree in all four areas of mental functioning (sustained concentration and persistence, understanding and memory, social interaction, and adaptation):

|  | **Sustained Concentration and Persistence Limitations** | Unlimited or very good | Limited but satisfactory | Seriously limited, but not precluded | Unable to meet competitive standards | No useful ability to function |
|---|---|---|---|---|---|---|
| A. | Carry out very short and simple instructions | X | | | | |
| B. | Carry out detailed instructions | | X | | | |
| C. | Maintain attention and concentration for extended periods | | X | | | |
| D. | Perform activities within a schedule | | X | | | |
| E. | Manage regular attendance and be punctual within customary tolerances | | X | | | |
| F. | Sustain an ordinary routine without special supervision | | X | | | |
| G. | Work in coordination with or in proximity to others without being distracted by them | | | X | | |
| H. | Complete a normal workday and workweek without interruptions from psychologically based symptoms | | | X | | |
| I. | Perform at a consistent pace without an unreasonable number and length of rest periods | | | X | | |

| | **Understanding and Memory Limitations** | Unlimited or very good | Limited but satisfactory | Seriously limited, but not precluded | Unable to meet competitive standards | No useful ability to function |
|---|---|---|---|---|---|---|
| A. | Remember location and work-like procedures | | X | | | |
| B. | Understand and remember very short and simple instructions | | X | | | |
| C. | Understand and remember detailed instructions | | X | | | |

| | **Social Interaction Limitations** | Unlimited or very good | Limited but satisfactory | Seriously limited, but not precluded | Unable to meet competitive standards | No useful ability to function |
|---|---|---|---|---|---|---|
| A. | Interact appropriately with the general public | X | | | | |
| B. | Ask simple questions or request assistance | X | | | | |
| C. | Accept instructions and respond appropriately to criticism from supervisors | X | | | | |
| D. | Get along with coworkers or peers without distracting them or exhibiting behavioral extremes | | | X | | |
| E. | Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness | X | | | | |

| | **Adaptation Limitations** | Unlimited or very good | Limited but satisfactory | Seriously limited, but not precluded | Unable to meet competitive standards | No useful ability to function |
|---|---|---|---|---|---|---|
| A. | Respond appropriately to changes in the work setting | | X | | | |
| B. | Be aware of normal hazards and take appropriate precautions | | X | | | |
| C. | Set realistic goals or make plans independently of others | X | | | | |

(Tr. 1166-67). Last, PA Yang opined Ms. Ortiz's impairments would cause her to be absent from work five days a week and to be off task the entire workday. (Tr. 1167).

21

STANDARD FOR DISABILITY

Eligibility for benefits is based on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process found at 20 C.F.R. § 404.1520 to determine whether a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Ortiz had not engaged in substantial gainful activity since April 21, 2020, the alleged onset date. (Tr. 26). At Step Two, the ALJ identified "systemic lupus erythematosus (SLE); migraine headaches; seizure disorder; status post right ankle fusion; major depressive disorder; generalized anxiety disorder; and posttraumatic stress disorder" as severe impairments. (*Id.*). At Step Three, the ALJ found Ms. Ortiz's impairments did not meet or medically equal the requirements of any listed impairment. (Tr. 26-28).

At Step Four, the ALJ determined Ms. Ortiz's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that she: requires the option to alternate sitting/standing every 30 minutes for one minute; can occasionally climb ramps and stairs; cannot climb ladders, ropes, or scaffolds; can occasionally stoop, kneel, crouch, and crawl; can frequently reach, handle, finger and feel; can tolerate no exposure to direct sunlight, unprotected heights, hazardous moving machinery, sharp tools or open flame; cannot operate motor vehicles; is restricted to simple, routine tasks, simple and short instructions, simple decisions, occasional work place changes, no strict production rate or hourly quotas, and occasional interaction with coworkers, supervisors and the public.

(Tr. 28). At Step Five, the ALJ found Ms. Ortiz could perform work in the national economy as a sorter, final assembler, and bonder, semiconductor. (Tr. 38). Thus, the ALJ concluded Ms. Ortiz was not disabled. (Tr. 38).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833

23

(6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

DISCUSSION

Ms. Ortiz contends the ALJ erred at Step Three by (1) not properly evaluating her headaches and finding that her condition medically equaled Listing 11.02B, and (2) not conducting a meaningful review of Listing 14.02A. (ECF #8 at PageID 1530, 1534). She also argues the ALJ did not properly evaluate the supportability and consistency of Dr. Diab's and PA Yang's medical opinions. (*Id.* at PageID 1540, 1542). The Commissioner argues substantial evidence supported the ALJ's Step Three findings and the ALJ properly discussed both the consistency and the supportability factors in evaluating the medical opinions. (ECF #10 at PageID 1550-51).

## I.  Evaluation of the Listings at Step Three

At Step Three of the evaluation process, the ALJ evaluates whether the claimant has an impairment or combination of impairments that meet or equal a listed impairment in appendix 1 and meets the duration requirement. 20 C.F.R. § 404.1520(a)(4)(iii). Appendix 1, in subpart P of part 404 of the regulations, lists and describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of her age, education, or work experience." 20 C.F.R. § 404.1525(a). If the claimant has an

25

impairment that meets or medically equals the criteria of a listed impairment, the claimant will be found disabled at Step Three. *Id.* § 404.1520(d). The claimant bears the burden of showing the severity of any claimed impairment meets or medically equals a listed impairment. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). To meet a listing, the claimant must present specific findings that satisfy the criteria of the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). If the claimant's impairment is not described in the listings, then the ALJ will compare the relevant findings to closely analogous listed impairments and will find the impairment is medically equivalent to the listing if the findings are "at least equal in severity and duration" to the criteria in the listing. 20 C.F.R. §§ 404.1526(a), (b)(2).

When determining whether an impairment is medically equivalent to a listed impairment, the ALJ must consider all evidence in the record about the impairment and its effects on the claimant. *Id.* § 404.1526(c). To allow meaningful judicial review of the ALJ's analysis, the ALJ must actually evaluate the evidence, compare it to the listing, and give an explained conclusion. *Reynolds v. Comm'r of Soc. Sec.*, 424 F.App'x 411, 416 (6th Cir. 2011). If the ALJ believes the record evidence does not reasonably support a finding that the claimant's impairments medically equal a listed impairment, the ALJ need not identify specific evidence to support the ALJ's conclusion. Social Security Ruling (SSR) 17-2p, 2017 WL 3928306, at *4 (Mar. 17, 2017). Generally, it is sufficient for the ALJ to state that the individual's impairment does not medically equal a listed impairment at Step Three, so long as the ALJ's reasoning at a later step in the evaluation process "provide[s] rationale that is sufficient for a [reviewing court] to determine the basis for the finding about medical equivalence." *Id.*; *see also Bledsoe v. Barnhart*, 165 F.App'x 408, 411 (6th Cir. 2006)

26

(looking to findings elsewhere in the ALJ's decision to affirm a medical-equivalency determination at Step Three, and finding no need for the ALJ to "spell out every fact a second time").

### A. The ALJ erred in evaluating whether Ms. Ortiz meets Listing 11.02B.

A headache disorder is not a listed impairment. Listing 11.02, for epilepsy, is the most closely analogous impairment. SSR 19-4p, 2019 WL 4169635, at *7 (Aug. 26, 2019). The criteria for Listing 11.02B require documentation of a detailed description of a typical dyscognitive seizure, occurring at least once a week for three consecutive months despite adherence to prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 11.02B. Ms. Ortiz argues her primary headache disorder is medically equivalent to Listing 11.02B. (ECF #8 at PageID 1530). SSR 19-4p describes how headaches are evaluated under that listing:

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from [an acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

2019 WL 4169635, at *7.

Here, the ALJ determined Ms. Ortiz's headache disorder did not medically equal Listing 11.02B because "there is no evidence that [she] suffers from migraines with the requisite frequency or that they have altered awareness or caused loss of consciousness meeting the listing." (Tr. 26). In reaching that conclusion, the ALJ did not compare any evidence to the listing or otherwise explain her reasoning. This conclusory explanation is not sufficient unless the ALJ's reasoning at a later

step in the evaluation allows the Court to determine the basis for the ALJ's finding on medical equivalence. I find it does not.

The ALJ discussed Ms. Ortiz's headaches when discussing her RFC at Step Four. When the claimant's impairment does not meet or equal a listed impairment at Step Three, the ALJ assesses and makes findings about the claimant's RFC based on all relevant evidence in the record. 20 C.F.R. § 404.1520(e). As part of the RFC determination, the ALJ evaluates the claimant's statements about her symptoms and the extent to which those symptoms can be reasonably accepted as consistent with the objective medical and other evidence in the record. 20 C.F.R. § 404.1529(a); *see also* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). As part of that assessment, the ALJ considers other relevant factors, including:

1.      Daily activities;

2.      The location, duration, frequency, and intensity of pain or other symptoms;

3.      Factors that precipitate or aggravate the symptoms;

4.      The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6.      Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.      Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2017 WL 5180304, at *7-8.

If the claimant's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical and other evidence, the ALJ will determine the

symptoms are more likely to reduce her capacity to perform work-related activities; conversely, if the statements are inconsistent with the evidence of record, the ALJ will find the symptoms are less likely to reduce her capacity. *Id.* at *8. When the claimant's statements are consistent with one another and the record evidence, the ALJ will find the symptoms are more likely to reduce her capacity. *Id.* at *9. But "inconsistencies in [a claimant's] statements made at varying times does not necessarily mean they are inaccurate[,]" because "[s]ymptoms vary in their intensity, persistence, and functional effects, or may worsen or improve with time." *Id.* That is why, in evaluating symptoms, the ALJ must make more than "a single, conclusory declaration that 'the individual's statements about [her] symptoms have been considered' or that 'the statement's about the individual's symptoms are (or are not) supported or consistent.'" *Id.* at *10. Nor is it enough "simply to recite the factors described in the regulations for evaluating symptoms." *Id.* The ALJ's "decision must contain specific reasons for the weight given the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated" so that a subsequent reviewer can assess how the ALJ evaluated the claimant's symptoms. *Id.* The ALJ "may not ignore evidence that does not support [her] decision, especially when that evidence, if accepted, would change [her] analysis." *Fleischer,* 774 F.Supp.2d at 881. The ALJ is not required to accept the claimant's statements as true if they are inconsistent with objective medical evidence or other evidence. *Jones,* 336 F.3d at 476; SSR 16-3p, 2017 WL 5180304, at *8. But the ALJ must clearly state her reasons for rejecting a claimant's statements. *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994).

Here, the ALJ acknowledged Ms. Ortiz's testimony endorsing three to four migraines a week that last all day (Tr. 29), and the medical records documenting her reported migraines and

headaches and treatment (Tr. 32-33, 35-36). Those statements, if accepted as true, could reasonably show that Ms. Ortiz had at least one migraine a week for at least three months. The ALJ necessarily rejected those impairment-related statements by determining there was no evidence that Ms. Ortiz has migraines at the frequency sufficient to equal the listing. (Tr. 29). But the ALJ did not weigh or assess the consistency of those statements with other evidence as the regulations require, leaving the Court to guess how the ALJ arrived at her conclusion.

In addition to not addressing the frequency of her migraines, the ALJ did not acknowledge Ms. Ortiz's statements or other relevant evidence about the functional effects of her migraines and so did not weigh or assess that evidence either. For example, during physical therapy sessions, Ms. Ortiz reported her migraines reduce her ability to concentrate or socialize and keep her from performing daily activities, like cooking and cleaning—statements the ALJ did not address. (Tr. 929, 1182). On at least one occasion, Ms. Ortiz completed her physical therapy exercises in a dark, quiet room to reduce provoking headache symptoms. (Tr. 927). She also endorsed photophobia (Tr. 941), a known symptom of primary headache disorders that may cause difficulty sustaining attention and concentration. SSR 19-4p, 2019 WL 4169635, at *8. This evidence and the other evidence of record could reasonably support a finding that Ms. Ortiz's migraines medically equal the severity and duration of Listing 11.02B. But again, the ALJ did not explain why she rejected that evidence.

The ALJ did not support or otherwise explain the conclusion that "there is no evidence that [Ms. Ortiz] suffers from migraines with the requisite frequency or that they have altered awareness or caused loss of consciousness meeting the listing" at Step Three or elsewhere in the decision. *See* SSR 17-2p. A court cannot uphold a decision, even if supported by substantial

evidence, if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F.Supp.2d at 877. Without the ALJ's explanation for rejecting evidence probative of whether Ms. Ortiz's migraines medically equaled 11.02B, the basis for the ALJ's finding about medical equivalence at Step Three is indeterminable.

This error was not harmless. A claimant who meets or medically equals a listed impairment is disabled within the meaning of the regulations and entitled to benefits without further analysis. 20 C.F.R. 404.1520(a)(4)(iii). If the ALJ had properly evaluated Ms. Ortiz's migraines at Step Three and found they medically equaled Listing 11.02B, Ms. Ortiz would receive benefits without the necessity of further evaluation at Steps Four and Five. *Reynolds*, 424 F.App'x at 416.

Standing alone, this error requires remand for further proceedings. For the sake of completeness, however, I address the other arguments Ms. Ortiz presented.

**B.     The ALJ did not err in not evaluating Listing 14.02A.**

Next, Ms. Ortiz argues the ALJ did not meaningfully review Listing 14.02A and asserts her SLE meets the requirements of that listing. To meet that listing there must be involvement with two or more organ/body systems, with (1) one of the organs/body systems involved to at least a moderate level of severity, and (2) at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).[15] 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 14.02A. Listing 14.02B, on the other hand, requires repeated manifestations of SLE, with at least two of the constitutional symptoms or signs and a marked limitation in (1) activities of daily

---

[15]     Severe fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function. Malaise means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function. *See* 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 7.00G(3).

living, (2) maintaining social functioning, or (3) completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. *Id.* § 14.02(B). As Ms. Ortiz correctly notes, the ALJ did not compare the evidence to Listing 14.02A but considered whether she met Listing 14.02(B). (*See* Tr. 26).

The relevant regulations direct the ALJ to find a claimant disabled when the claimant meets a listing, but the ALJ need not discuss listings the claimant clearly does not meet. *Sheeks v. Comm'r of Soc. Sec.*, 544 F.App'x. 639, 641 (6th Cir. 2013). When the record "raises a substantial question as to whether [the claimant] could qualify as disabled" under a listing, the ALJ should discuss that listing. *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).

Setting aside whether her SLE affects two or more organs/body systems and whether one of those systems is at least moderately severe, Ms. Ortiz has not shown at least two constitutional symptoms or signs that rise to the severity required to meet Listing 14.02A. First, the record shows she once reported she was "very fatigued," with other reports of moderate fatigue or fatigue of an unspecified severity. (*See, e.g.,* Tr. 367, 440, 588, 599, 616, 933, 950, 1192). Second, no record evidence suggests Ms. Ortiz suffered fevers regularly. Third, she contends she reported malaise but the cited medical evidence contains no such complaint. (*See* ECF #8 at PageID 1536) (citing Tr. 1193). Fourth, Ms. Ortiz did not lose weight involuntarily but as the result of surgery intended to promote weight loss. (*See* Tr. 398, 577). The record does not raise a substantial question as to whether Ms. Ortiz meets Listing 14.02A. The ALJ thus did not commit reversible error in not discussing the listing. *Sheeks,* 544 F.App'x at 641.

32

## II.     Evaluation of Medical Opinions for Consistency and Supportability

Next, Ms. Ortiz claims the ALJ erred in evaluating Dr. Diab's and PA Yang's medical opinions. As part of the RFC assessment, the ALJ must review all medical opinions and explain their persuasiveness. See 20 C.F.R. § 404.1520c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The regulations require that the ALJ "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions," the two most important factors. *See id.* § 404.1520c(b)(2). Supportability is "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation" and consistency is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5853 (Jan. 18, 2017).

The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* at 5859. The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). But an ALJ need not specifically use the terms "supportability" or

33

"consistency" so long as the analysis substantively engages with those factors. *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at \*3 (N.D. Ohio Sept. 9, 2022). If the ALJ discusses both consistency and supportability, and substantial evidence supports that discussion, the Court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at \*7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

### A.    The ALJ erred in evaluating Dr. Diab's medical opinion.

The ALJ reviewed Dr. Diab's medical opinion and found the following:

> Dr. Diab completed a form statement of claimant's functioning dated April 13, 2023. Claimant's diagnosis was SLE. Symptoms were identified to include fatigue, skin rashes, photosensitivity, polyarthritis, seizure disorder, multiple joint pains off and on, and pleurisy. Dr. Diab opined that claimant could lift, carry, push and pull 10 pounds occasionally and 20 pounds rarely. Dr. Diab opined that in an eight-hour workday, with normal breaks, claimant could sit for four hours, and she could stand/walk for about two hours. Claimant would need unscheduled work breaks. Claimant could use her hands, fingers and arms 20% of the work period, during flares. Dr. Diab opined that claimant was likely to be absent three days per month due to her impairments. Dr. Diab wrote that noise, chemicals, sun exposure, stress and dust might contribute to intermittent flares. Dr. Diab's opinions were perhaps overly sympathetic to the patient and were not persuasive. Nothing in Diab's own treatment records or elsewhere in contemporaneous treatment documentation supports flare ups of the frequency and severity alleged by claimant (and apparently adopted wholesale by Dr. Diab).

(Tr. 33-34) (cleaned up).

This evaluation is problematic because the ALJ asserts the opinions are inconsistent with Dr. Diab's records and not supported by contemporaneous records but did not engage in any meaningful review of that evidence. For instance, the ALJ acknowledged Ms. Ortiz met with Dr. Diab on five occasions in 2021, but did not discuss any statements she made to the doctor or the doctor's findings on numerous examinations. (Tr. 30-31). The ALJ gave similar treatment to Ms.

34

Ortiz's 2022 and 2023 appointments with Dr. Diab, noting they met five times but not acknowledging her reported complaints to Dr. Diab or the doctor's examination findings or notes. (Tr. 31-33). Because the ALJ neither mentioned those reports and findings when analyzing Dr. Diab's opinion nor offered insight about how the ALJ weighed that evidence, a meaningful review of the ALJ's conclusions for substantial evidence is not possible. *Shrader*, 2012 WL 5383120, at *6 ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

This error is not harmless. Although "[t]he Sixth Circuit has not yet addressed if or when an ALJ's failure to properly analyze a medical opinion for supportability and consistency under the revised § 404.1520c(b)(2) can be excused as harmless error," courts in this district "have applied the harmless error standard when evaluating an ALJ's treatment of an expert medical opinion for applications after the revision." *Hamm v. Comm'r of Soc. Sec.*, No. 1:25-cv-423, 2025 WL 3687383, at *6 (N.D. Ohio Dec. 19, 2025) (collecting cases). Failure to consider an opinion in accordance with the regulations is harmless error "if the ALJ adopted the opinion or made findings consistent with the opinion" or if the opinion is so patently deficient the Commissioner could not possibly credit it. *Id.* None of those situations apply here. First, the ALJ did not adopt the opinion. Second, the ALJ's finding that Ms. Ortiz can frequently handle, finger, and feel directly conflicts with Dr. Diab's opinion that she can do those tasks for just 20% of the workday. (*Compare* Tr. 28 *with* Tr. 1163). *See* SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983) (defining "frequent" to mean "occurring from one-third to two-thirds of the time."). In addition, Dr. Diab concluded that noise, chemicals, sun exposure, stress, and dust may contribute to SLE-related flareups, a limitation not consistent with the ALJ's findings that address sun exposure directly and stress indirectly but do

not address chemical or pulmonary irritants. Third, Dr. Diab's opinion is not "patently deficient." The Sixth Circuit has held that a "checkbox physician opinion" without explanation is "patently deficient." *Hernandez v. Comm'r of Soc. Sec.*, 664 F.App'x 468, 474-75 (6th Cir. 2016). Dr. Diab's opinion does not meet the "patently deficient" standard because he cited supporting objective medical evidence, observations, and symptoms to explain the basis for his opinion.

I thus recommend that on remand, the ALJ must explain how the medical record is inconsistent with Dr. Diab's opinion such that meaningful review of the ALJ's conclusions for substantial evidence can be conducted.

**B.     The ALJ properly evaluated PA Yang's medical opinion.**

Ms. Ortiz also argues the ALJ erred in evaluating PA Yang's medical opinion. The ALJ determined PA Yang's opinion was not persuasive, stating:

> PA Yang completed a form statement of claimant's mental functioning dated June 6, 2023. The PA had seen claimant about monthly since March 2020. The PA identified claimant's symptoms to include irritability, lack of proper decision-making, and disorganized thoughts. PA Yang checked boxes indicating serious mental limitations in working in coordination with or in proximity to others without being distracted by them, completing a normal workday and work week without interruptions from psychologically based symptoms, performing at a consistent pace without unreasonable number and length of rest periods, and getting along with coworkers and peers without distracting them or exhibiting behavioral extremes. PA Yang then incongruously opined that claimant would be absent five days per week as well as off task 100% of the work period due to her impairments. PA Yang's form statement was internally inconsistent and regarding absences and time off task, lacking support in contemporaneous treatment documentation or elsewhere in the record. PA Yang's form statement was not persuasive, particularly in light of the PA's own repeated notes regarding claimant's reported activities and her presentation at their frequent visits.

(Tr. 34-35) (cleaned up).

Though the analysis is brief, I find no error in the ALJ's evaluation of PA Yang's opinion. First, substantial evidence supports the ALJ's determination that PA Yang's opined functional

limitations are internally inconsistent. Indeed, it is difficult to understand how one could be seriously limited in, but not precluded from, performing at a consistent pace without unreasonable number and length of rest periods and yet be off-task 100% of the workday. Though the ALJ did not label it as such, this analysis of "the source's supporting explanation" goes to the supportability factor. *See* 82 Fed. Reg. at 5853. Second, substantial evidence supports the ALJ's application of the consistency factor to conclude PA Yang's opinion that she would be off task all the time was inconsistent with Ms. Ortiz's activities reported during her counseling sessions, including camping with family and trips to Puerto Rico. Similarly, the ALJ reasonably concluded PA Yang's opinion that she would be absent from work five days a week was inconsistent with her attendance at frequent counseling appointments and there was no evidence elsewhere in the record suggesting she, for instance, regularly missed appointments with other providers due to her symptoms. Thus, substantial evidence supports the ALJ's application of the supportability and consistency factors to PA Yang's opinion. Thus, my recommended remand does not extend to re-evaluating this opinion.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and **REMAND** for further administrative proceedings not inconsistent with this Report and Recommendation.

Dated: February 25, 2026

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).